**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. LKG-25-136** |
| | : | |
| **CHARLES EDWARDS MADDEN,** | : | |
| | : | |
| **Defendant** | : | |

## MOTION FOR RELEASE FROM CUSTODY AND REQUEST FOR HEARING

Defendant Charles Edwards Madden ("Mr. Madden"), by and through his counsel, John M. McKenna, and Brennan, McKenna & Lawlor, Chtd., respectfully requests a hearing to address his detention status in this matter pursuant to 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). Mr. Madden further requests that the Court reconsider its threshold finding on the question of whether this case involves a serious risk of flight such that Government may even properly seek detention. To the extent the Court does not reconsider that finding, Mr. Madden requests that the Court order his release subject to reasonable conditions. Mr. Madden respectfully requests a hearing on this matter. In support of this Motion, counsel states as follows:

1.      On May 1, 2025, the Government filed a sealed Indictment charging Mr. Madden and one co-defendant with several offenses. (ECF No. 1.) Mr. Madden in particular is charged with the following offenses: conspiracy (buying and selling

1

stolen vehicles; receipt of stolen vehicles; tampering with vehicle identification numbers), in violation of 18 U.S.C. § 371 (Count One); conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Two); operating a chop shop, in violation of 18 U.S.C. §§ 2322 and 2 (Count Three); sale or receipt of stolen vehicles, in violation of 18 U.S.C. § 2313 (Counts Four through Fourteen); and trafficking in stolen vehicles with altered VIN, in violation of 18 U.S.C. § 2321 (Counts Fifteen through Twenty-Two). On May 13, 2025, Co-Defendant Bourne was arrested in Rhode Island. On May 14, 2025, the United States District Court for the District of Rhode Island ordered co-defendant Bourne released pending an initial appearance in this District. (ECF No. 10.) On May 21, 2025, co-defendant Bourne made his initial appearance before this Court, at which time he was again ordered released. (ECF No. 15.) On July 1, 2025, FBI agents arrested Mr. Bourne at an apartment at 901 H Street Northeast in D.C.

2.    On July 2, 2025, Mr. Madden appeared before Judge Quereshi for an initial appearance and arraignment. Mr. Madden was appointed counsel pursuant to the Criminal Justice Act. After the arraignment, the Government announced that it was seeking Mr. Madden's detention based on a risk of nonappearance and danger to the community.[1] The Government further clarified that it was moving for

---

[1] The mere invocation of "danger to the community" is an impermissible basis on which to seek detention, "Danger to the community" is not among the 18 U.S.C. § 3142(f) factors. *E.g.*, *United States v. Gunn*, No. 3:19-mj-00207, 2019 U.S. Dist. LEXIS 210792, at *7 (D. Or. Dec. 6, 2019) ("Wire fraud and money laundering are not included in

2

detention under 18 U.S.C. § 3142(f)(2)(A) and would be making a proffer to attempt to meet its burden to establish that Mr. Madden's case involves a "serious risk" of flight. In its presentation, the Government relied in large part on dated allegations of prior nonappearance in state court matters and on conduct in which it alleged Mr. Madden engaged after the return of the Indictment but before his arrest. The Court concluded that the Government had established a serious risk of flight and set in a detention hearing. However, the next day, Mr. Madden consented to detention without prejudice to his risk to seek a prompt hearing to address his detention. (ECF No. 34.) On August 8, 2025, the undersigned counsel entered his appearance. (ECF No. 45.)

3.    As an initial matter, the Court should reconsider its finding that the Government met its burden to demonstrate that this case involves a serious risk of flight such that detention is even permissible.[2] The Government failed to do so. Accordingly, Mr. Madden's continued detention is unlawful and he should be released forthwith. To establish a serious risk of flight, the Government must make "a substantial showing that the defendant will take deliberate, voluntary action to flee to evade judicial oversight." *United States v. Fuentes*, No. 5:24-CR-00122-

---

the list of enumerated offenses under 18 U.S.C. § 3142(f)(1), and therefore the United States was not authorized to seek pretrial detention on the ground of danger alone.").

[2] Reconsideration is appropriate because prior counsel who represented Mr. Madden at the initial appearance did not have access to any discovery in this matter and therefore was constrained in the ability to contest the Government's proffer. The undersigned counsel has now received voluminous discovery and has started the process of reviewing it. Counsel understands that additional discovery is forthcoming.

KKC-MAS, 2025 U.S. Dist. LEXIS 39085, at *4 (E.D. Ky. Mar. 5, 2025). "That is, the government must show *flight* rather than mere nonappearance in court, as well as that the risk not only exists but is a serious one." *United States v. Mejias-Mejias*, 771 F. Supp. 3d 688, 691 (D. Md. 2025) (emphasis in original). This Court applies a "a preponderance of evidence standard to the Section 3142(f)(2)(A) analysis." *Mejias-Mejias*, 771 F. Supp. 3d at 692. In its argument at the initial appearance, the Government focused on dated allegations of nonappearance in state proceedings and a distorted characterization of Mr. Madden's post-indictment, pre-arrest conduct. With respect to allegations of nonappearance in other proceedings in 2008 and 2010, the Government relied heavily on the Pretrial Services Report. But that document contains no information that would establish that any prior allegation of nonappearance was based on a willful, deliberate flight from the jurisdiction of any court. Notwithstanding the Government's thorough investigation into Mr. Madden's background, the Government offered no details of the events leading to the issuance of any bench warrants. Simply put, the issuance of bench warrants more than 15 years ago does not come close to establishing a serious risk of flight.

4.    As to allegations of post-indictment, pre-arrest conduct, the Government's argument was far from clear and appears to rest on several faulty premises. In short, the Government proffered that after his arrest on May 13, Mr. Bourne called Mr. Madden from a detention facility and told Mr. Madden that he

4

expected to be taken to D.C. in connection with a federal arrest warrant. The Government alleges that after this call, Mr. Madden became aware that he too had been indicted in this matter and that he then changed his pattern of life to avoid arrest. The Government argued that these circumstances show a serious risk of flight. First, the Government argued that after Mr. Bourne's arrest, Mr. Madden stopped spending time at the premises of 6102-6104 Skyline Terrace in Suitland, Maryland. This property was the subject of Prince George's County search warrants in May 2020 and November 2023. At the initial appearance, the Government argued that Mr. Madden used this property as a residence, even though it was "not supposed" to be used for such a purpose. That argument is confusing. The Indictment (ECF No. 1 at 3) states that the property was "zoned for residential use[.]" Additionally, in a March 2024 affidavit in support of a warrant to search an extraction of Mr. Madden's cell phone, the Government represented that the property at 6102 Skyline Terrace is zoned as "residential single family." It is therefore unclear why the Government would seek to have this Court draw any negative inference from the fact that Mr. Madden used a residential property as a residence. Nonetheless, alleged zoning violations do not establish a serious risk of flight.

5.      Second, the Government argued that after Mr. Bourne's arrest, Mr. Madden began spending his time at an apartment at 901 H Street Northeast, a residence law enforcement had not connected to him. The implication of the

Government's argument is that Mr. Madden selected this apartment as a hideout. The Government submitted cell site mapping showing the towers off of which Mr. Madden's phone hit in mid-May 2025. By way of background, on May 20, 2025, the Government sought and obtained a warrant for historical cell site location data associated with Mr. Madden's cell phone number dating back to January 2, 2025. AT&T provided this information on May 21, 2025. Counsel has reviewed some of this data. From even an initial review, it appears that Mr. Madden's cell phone pinged off of a tower located in close proximity 901 H Street on *at least* the following dates *before* the return of the Indictment: March 25, 26, 28, 29, 30, 31, April 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 30. It is simply not correct that Mr. Madden *suddenly* began spending time at the H Street address after Mr. Bourne's arrest. The lessee of the relevant apartment is Mr. Madden's friend. Cell site location information supports an inference that Mr. Madden frequently spent time at the H Street address well before the return of the Indictment. That law enforcement was previously unaware of Mr. Madden's relationship with the lessee is of no moment with respect to the § 3142(f)(2)(A) analysis.

6.      The Government also argued that Mr. Madden's conduct at the time of the execution of the arrest warrant demonstrated a serious risk of flight. In the early morning hours of July 1, 2025, several FBI agents reported to the H Street apartment to arrest Mr. Madden and execute a search warrant. As the agents approached the

apartment from the hallway, one agent directed the others to be quiet. An agent suddenly and loudly banged on the door of the apartment and announced the existence of a search warrant. Approximately 18 seconds elapsed between the first knock and the agent opening the door. Mr. Madden's friend, a woman wearing sleeping clothes, was present by the door. The agent then opened the door further. Mr. Madden, who was wearing only very short boxer brief underwear, appeared to be moving towards the back of the apartment. As soon as the officer directed him to raise his hands, Mr. Madden complied and stepped towards the agents to be arrested. He did not resist arrest. The woman and her young child were then directed out of the apartment. The agents speculated that Mr. Madden intended to jump from the balcony. The Government seems to have adopted that speculation based on its comments at the initial appearance. Had Mr. Madden jumped from this height, he likely would have been seriously injured. And he certainly would not have made it far in a nearly nude state.



7.    The *reasonable* inference to be drawn from the circumstances of the raid is that Mr. Madden, who was dressed for bed, was startled and disoriented by extremely loud noises in the early morning hours. He was likely terrified by an *armed man wearing a black face covering* forcing his way into the apartment.

8.    The Government also argued that Mr. Madden's use of WhatsApp – from a location in the District of Columbia – somehow proves a serious risk of *flight*. Not so. First, the use of an internet-based messaging application does not show flight of any kind. Second, the Government has known since late 2023, when its investigative team began searching a cell phone seized from Mr. Madden, that Mr. Madden regularly uses WhatsApp to communicate.[3] Had Mr. Madden truly intended to conceal his communications, he would have switched to another messaging

---

[3] Mr. Madden does not concede that the Government's extended seizure and repeated searches of the contents of his cell phone complied with the Fourth Amendment and reserves all suppression arguments. He reserves the right to challenge all searches and seizures for which he has standing in this case.

platform like Telegram, Wickr, or Signal. And he certainly would not have been using the wifi connection of an apartment that he frequented long before the return of the Indictment to send messages.

9.     In sum, the Government's speculation on the basis of dated alleged failures to appear falls far short of establishing a serious risk of flight. *See, e.g.*, *United States v. White*, No. 3:21-mj-04070, 2021 U.S. Dist. LEXIS 100544, at \*39 (M.D. Tenn. May 27, 2021); *Fuentes*, 2025 U.S. Dist. LEXIS 39085, at \*5. And the fact that Mr. Madden was arrested at an apartment in the District of Columbia that is located 12 miles away from this Court, was leased by a friend, and at which Mr. Madden frequently spent time in the months *before* the return of the Indictment (as confirmed by data the Government has had since May 21), does not show a serious risk of flight. This Court should reconsider its § 3142(f)(2)(A) finding and order Mr. Madden's forthwith release.

10.     Even if the Court declines to revisit its § 3142(f)(2)(A) finding, the Court should order Mr. Madden's release subject to reasonable conditions. The law presumes that a person facing federal criminal charges should be released pending trial. *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.).

11.     A person facing federal criminal charges may be detained only where a court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). "To obtain a detention order, the government must prove the court appearance or 'flight risk' issue by a preponderance of the evidence, and the safety of the community—measured by whether a defendant presents a danger to the community—by clear and convincing evidence." *United States v. Reeves*, No. 5:23-cr-00002, 2023 U.S. Dist. LEXIS 54624, at *7 (W.D. Va. Mar. 29, 2023) (citing *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001)). In conducting its analysis, this Court considers the factors found at 18 U.S.C. § 3142(g).

12.     This Court can set appropriate conditions of release both to assure the safety of the community and Mr. Madden's appearance in court as required. As an initial matter, the Government raised no serious argument that Mr. Madden's release would pose a danger to the community. Mr. Madden is charged with economic and property offenses. He has no prior convictions for any violent conduct. Accordingly, Mr. Madden will focus on arguments that go to the analysis of risk of nonappearance.

13.     With respect to the nature and circumstances of the offenses charged, the Government has alleged, as noted above, economic and property offenses. As to Mr. Madden, the most recent alleged unlawful act identified in the Indictment with

any degree of specificity dates back to February 2024. At the initial appearance, the Government cited the fact that Mr. Madden is charged in more counts than is Mr. Bourne. Yet both defendants are charged with the same general type of conduct, and Mr. Bourne is alleged to have committed an overt act in furtherance of the conspiracy charged in Count One on April 23, 2024. Mr. Bourne was ordered released. The nature and circumstances of the nonviolent offenses charged in this case poses no barrier to release. The Bail Reform Act does not apply a presumption of detention in this case. To the contrary, the law presumes that Mr. Madden should be released.

14.  Judges in this District have ordered release pending trial in cases involving allegations of large loss figures. For example, in *United States v. Tianna Cosby*, No. PX-23-442, Judge Simms ordered the release of a defendant who later admitted to serving as an organizer or leader of a stolen check scheme involving millions of dollars in loss. In *United States v. Patrick Britton-Harr*, Nos. ABA-25-143 and ABA-25-144, Judge Crawford ordered the release of a defendant who is charged with wire fraud and health care fraud involving millions of dollars. Mr. Madden should also be released.

15.  As to the second § 3142(g) factor, courts have recognized that "the weight of the evidence is the least important of the various factors." *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985). Additionally, courts "have cautioned that a district court assessing the weight of the evidence must not consider

the evidence of defendant's guilt, but rather must consider only the weight of the evidence of the defendant's dangerousness." *United States v. Taylor*, No. 1:21-cr-392-RCL-2, 2021 U.S. Dist. LEXIS 150500, at *14 (D.D.C. Aug. 11, 2021) (internal quotation and citation omitted). Furthermore, Congress has mandated that no provision of the Bail Reform Act "shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j). This factor supports release. Prince George's County has been investigating this matter since at least 2020, when PGPD first executed a search warrant at the Skyline Terrace residence. Law enforcement declined to proceed with prosecution. Even after the November 2023 search, state authorities dismissed their charges against Mr. Madden. The FBI has been investigating this matter since at least December 2023. It obtained the bulk of its evidence from the earlier Prince George's County investigation. Yet the Government did not see fit to bring charges until May 2025. While the Government may argue that it is permitted to act at its own pace, the Government cannot delay and then credibly claim to the Court that there is now some urgent risk of danger or flight such that Mr. Madden should be detained.

16.     Mr. Madden's history and characteristics also support release. As the Government did not contest at the initial appearance, Mr. Madden has strong ties to the District of Maryland. His mother and one of his sisters live here. Though Mr. Madden was born in Jamaica, he has lived in the United States for more than 20

years. Mr. Madden has a minimal criminal history. He has no convictions for crimes of violence or firearms offenses. While Mr. Madden does have a conviction for possession with intent to distribute marijuana, that conviction is dated. It simply has no probative value. Marijuana is now legal for recreational use in Maryland. Possession with intent to distribute marijuana is now a misdemeanor offense in Maryland. Mr. Madden is not currently on probation. Nor was he on probation at any time during the alleged offenses. Mr. Madden's family members, including his mother and sisters, are committed to supporting him. Several family members are expected to be present at the hearing with respect to detention. A man with a minimal criminal history, strong ties to the community, and abundant family support should not be detained pending trial in a case involving nonviolent offenses.

17.     As for the nature and seriousness of the danger that would be posed by release, there is none. Mr. Madden has no convictions for crimes of violence. Mr. Madden has no convictions for firearms offenses. Mr. Madden is not charged with violent offenses. He is not charged with offenses involving guns or dangerous drugs.

18.     To the extent the Government would argue that the existence of an ICE detainer is evidence of risk of flight or in any way supports detention, courts have considered and rejected this line of argument. *Mejias-Mejias*, 771 F. Supp. 3d at 692 ("The third overarching question concerns the government's contention that the existence of an ICE detainer is dispositive. The Court disagrees. Instead, the Court

is persuaded by the analysis of other courts who found that the Bail Reform Act considers flight as an act of volition; non-appearance caused by the action of another entity—including a different government agency—does not suggest that the accused chose to flee and not appear in court.") (collecting cases). Moreover, Department of Justice data shows that undocumented individuals have an even lower rate of non-appearance than U.S. citizens: U.S. citizens fail to appear 0.9% of the time whereas undocumented individuals fail to appear 0.5% of the time. U.S. Dept. of Justice Bureau of Justice Statistics, Pretrial Release and Misconduct in Federal District Courts, Fiscal Years 2011–2018, at 11 tbl.9 (Mar. 2022)

19.     Should the Court determine that this is a case in which detention is authorized, Mr. Madden proposes that he be released to the third-party custody of his mother, who lives at a home in New Carrolton, Maryland.[4] Mr. Madden submits that release to the third-party custody of his mother, with additional conditions of a curfew or location monitoring, will adequately ensure Mr. Madden's appearance in court and the safety of the community.

20.     For the reasons set forth above and those to be presented a hearing, this Court should release Mr. Madden pending trial. Mr. Madden respectfully requests a hearing on the matter of detention. In light of the request for reconsideration of the

---

[4] Counsel will provide information about the proposed third-party custodian to Pretrial Services and the Government.

14

§ 3142(f)(2)(A) ruling, Mr. Madden requests that this matter be set before Judge Quereshi.

Respectfully submitted,

s/_____
John M. McKenna
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane
Suite 700
Greenbelt, Maryland 20770
301-474-0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 21, 2025, a copy of the foregoing was sent to the United States Attorney's Office for the District of Maryland, via ECF.

s/_____
John M. McKenna